OPINION OF THE COURT
William J. Regan, S.
In this application for adoption the foster mother is the natural mother of the foster child. The foster child was born out of wedlock on August 2, 1974. The natural mother, subsequent to the child’s date of birth, married the foster father, who has joined in this adoption proceeding. A filiation order was entered on December 18, 1974 with the Erie County *26 Family Court of the State of New York, declaring the respondent to be the father of the foster child, and providing for support payments. Notice was required to be given to the natural father pursuant to section 111-a of the Domestic Relations Law, and respondent appeared pursuant to said notice for the purpose of voicing his objections to this adoption. An investigation had been directed by the court and the report has since been received and reviewed by the undersigned. It appears to the court from the testimony, as well as the court appearances of the petitioners and the investigation made into the adoption, that the marriage of the foster parents is a stable one. The husband appears to have a steady job with an income somewhere in the area of $25,000. He is reputed to be of good moral character and of good standing in the community. On the return date of the citation served upon the natural father, which was originally September 26, 1977, the natural father appeared and indicated his intentions at that time to oppose the adoption. Respondent was given the opportunity to consult counsel relative to a hearing on the merits of his objections. The matter was at that time adjourned to October 25, 1977, at which time respondent again appeared without counsel and stated to the court that: "I spoke with an attorney and the advice he gave me was just to come down and state as to why I would object to the adoption, and I think that for a son to have a father, a natural father’s concern for him and the love, that is the best thing for any child to have and on those grounds”.
Respondent stated specifically that he saw no need for a hearing relative to the fitness or unfitness of the petitioners, that he wanted the court to consider only "what is in the best interest of the child”, that being his understanding as being the only matter to be considered by the court. Respondent poses to the court the question: "Is it not in the best interest of the child to know who his real father is and he will always be around?” The issue presents the problem as to how one does determine what is in the best interest of the child. As suggested in an earlier decision of this court under date of September 10, 1974, File No. 2895, the rights of the out-of-wedlock father are not in issue. ("Doe" v Department of Social Servs., 71 Misc 2d 666; Stanley v Illinois, 405 US 645.) The court held then, and reiterates at this time, that the natural father has a substantial interest in the adoption of his child. As determined at that time, and as now clarified by statute *27 (Domestic Relations Law, § 111-a), while the consent of the out-of-wedlock father is not necessary to the granting of the adoption, notice is essential to afford the natural father an opportunity to be heard. The parental rights of unwed fathers are substantially on a par with the rights granted to married parents. By statute, however, the consent of the out-of-wedlock father is not required. The best interest of the child is of paramount concern to the court. Section 111-a of the Domestic Relations Law provides as follows: "3. The sole purpose of notice under this section shall be to enable the person pursuant to subdivision two to present evidence to the court relevant to the best interests of the child.” The natural father, therefore, elected to present no further evidence other than his own general statement to the effect that: "I see my son as often as I can. I talk to him two or three times a week”.
In a situation such as this, the issue is not one of natural parents against adoptive parents. Natural rights as such are not an issue. This court knows of no rule or criterion by which best interests of a child can be defined. There are many factors and considerations to be considered. What can be applied to one person may not be applicable to another. The court is of the firm belief that a child belongs with his natural parents. Obviously the experience, background and general environment and attitudes of the Judge in each case where such a determination must be made, play a great part. In one instance a great weight might be given to the emotional stability of an infant under the circumstances, whereas in another instance greater weight might be given to the financial or future economic stability of the foster child. So again, in arriving at a determination, a Judge or Surrogate could only be guided by his own years of experience in dealing with adoption, custody and guardianship situations and in his everyday application of that experience. The problem becomes somewhat less when there is an opportunity to speak with the child personally and to receive a first-hand opinion as to the child’s own thinking and attitudes pertaining to his environment and parents. This of course is not possible when the child is of such tender years as to lack sufficient understanding. Generally the court is of the firm belief that a child belongs with his natural parents, but when the natural parents elect not to marry each other and there is a subsequent marriage of one to a third person as here, the rights of natural parents are not in issue and realism dictates a some *28 what different approach. If at all possible, the antagonisms that may well exist between the natural parents during the child’s formative years should not be permitted to interfere with the normal upbringing of a child. To come to the point, however, of the question posed by respondent, is it truly in the best interest of the infant to be aware of two fathers, one a natural father who alleged that he will at all times be ready, willing and able to offer financial help and assistance, as well as love and affection, and the other a foster father who will voluntarily assume the burdens of parenthood? To answer respondent in the affirmative would be to create for the foster child a possible escape hatch on every occasion when there is dissension in the family unit, and on any occasion when the child’s material needs or desires are resisted. Discipline and normal behavior would be severely challenged. Certainly this is not conducive to the maintenance of the well-being of a family. Discipline, parental obedience, etc., must be maintained on a level consistent with mutual love and attention.
In view of the above, and after hearing extensive testimony and after having reviewed a most favorable adoption investigation, petitioners’ application for the approval of this adoption is hereby granted, and the objections of the respondent are accordingly dismissed.